REGENE SHANNON, PLAINTIFF AND RESPONDENT, *v.* HOWARD S. WRIGHT, A WASHINGTON CORPORATION, AND BIG SKY OF MONTANA, INC., A DELAWARE CORPORATION, DEFENDANTS AND APPELLANTS.

No. 14194.
Submitted Dec. 5, 1978.
Decided April 6, 1979.
593 P.2d 438.

270

Brown, Pepper & Kommers, Gene I. Brown, argued, Bozeman, for defendants and appellants.

Morrow, Sedivy & Olson, Edmund P. Sedivy, Jr., argued, Bozeman, for plaintiff and respondent.

MR. JUSTICE SHEA delivered the opinion of the Court.

Defendants Howard S. Wright Construction Co. (Wright) and Big Sky of Montana (Big Sky) bring this appeal from a judgment of the District Court, Madison County, sitting with a jury. The jury found Wright and Big Sky liable to plaintiff Regene Shannon for personal injuries he sustained while employed as a plumber at Big Sky's resort near Bozeman, Montana, and assessed $250,000 against the defendants as compensation for Shannon's injuries.

On this appeal the defendants, Wright and Big Sky contend that they were improperly held liable for Shannon's injuries because:

1. Shannon was contributorily negligent, and

2. As owner and prime contractor, they had not duty to provide Shannon, the employee of a subcontractor, with a safe place to work.

We conclude that Shannon is not barred from recovery by contributory negligence and that under the circumstances of this case Wright and Big Sky had a duty to provide Shannon with a safe place to work.

The plaintiff, a journeyman plumber, was an employee of F. E. DeBeer Mechanical, which had subcontracted with Wright to perform the plumbing and mechanical work at the Big Sky resort. On the day of the accident, October 4, 1973, plaintiff was working at a condominium unit known as "Stillwater B". His work required him to be on the upper floor of the partially-constructed condominium that day. Access to the second floor could be obtained in either of two ways. First a plank, measuring about eight inches wide spanned the distance between the hill behind "Stillwater B" and a wooden beam which extended off the condominium unit. The plank was set over a deep ditch and had no handrails. Second, the plaintiff had access by a ladder which was placed on the ground under a second floor window casing. Apparently most of the tradesman who required access to the upper level of "Stillwater B" used the ladder, and entered the condominium through the unfinished window frame. As Shannon used the ladder that morning he felt it move. He testified that the next thing he remembered was waking up on the ground with several men standing around him. In his fall, Shannon received a severe compound fracture of his right ankle.

Some two years after the accident, following repeated medical procedures to correct the fractured ankle, and with the medical prognosis of permanent impairment of function, the plaintiff brought an action against his employer, DeBeer Mechanical, the general contractor, Wright, and the owner of the resort project, Big Sky. After filing the lawsuit, plaintiff entered into a separate convenant not to sue with DeBeer, and maintained his cause against Wright and Big Sky.

■ In their first defense, Wright and Big Sky contend that Shannon was guilty of contributory negligence, and under the law applicable at the time of the accident, Shannon must be barred from any recovery against them. Specifically, the defendants argue that Shannon ignored standard procedure by his failure to determine if the ladder was in some way tied off at the top to prevent it from slipping. In failing to exercise reasonable care for his own safety, they argued, Shannon proximately caused his own injuries and is barred from recovery for them.

A review of Shannon's testimony shows that he had seen a fellow employee, Burch, start up a ladder shortly before he climbed onto the same ladder. He did not see Burch reach the top of the ladder, but assumed that he had gone in through the window casing. Thus, when Shannon started up the ladder he had some cause to believe it was secure. When Shannon neared the top, he felt the ladder move, and knew nothing more until he awoke on the ground, surrounded by men standing over and assisting him.

The Restatement (Second) of Torts provides in section 343A that a possessor of land has a duty to protect invitees, in certain circumstances, against even obvious dangers:

"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" (Emphasis added.)

This rule usefully serves to balance the duties of landowner and invitee, and to eliminate some of the harshness of a strict contributory negligence rule, especially in situations such as construction where various dangers are likely to exist. As the Second Circuit Court of Appeals has observed:

"Although the invitee (or in this case the employee) may be under a duty to avoid harm likely to result to him from open and obvious dangers, he may not be in a position fully to appreciate the risk or to avoid the danger even though aware of it. For instance, his attention may be distracted or his duties as an employee may require

his unavoidable exposure to it." *Napoli v. Hellenic Lines, Ltd.* (2d. Cir. 1976), 536 F.2d 505, 508.

Thus, in situations where an accident victim is likely to be distracted and forget about the danger to him, some jurisdictions refuse to hold that a plaintiff will be barred from recovery by his own contributory negligence. *Barrett v. Foster Grant Co.* (1st Cir. 1971), 450 F.2d 1146, 1153. This is especially so in situations where an employee is involved and the employee, if he is to continue his employment, has no alternative but to continue facing the risk or hazard. *Bitsos v. Red Owl Stores, Inc.* (8th Cir. 1972), 459 F.2d 656, 662; Restatement (Second) of Torts, § 343A, Comment f.(1965). In *Bitsos,* a refrigerator repairman, in order to complete a job for the defendant, was forced to use a dark obstructed stairway. Even though he had been up and down the stairway several times and knew of its hazardous condition, the repairman was still permitted to recover when he eventually fell and injured himself. *Lake v. Emigh* (1946), 118 Mont. 325, 167 P.2d 575, relied upon by defendants to bar plaintiff's recovery in this case, does not deal with the problem of an employee working in a potentially hazardous situation. In *Lake,* the plaintiff was a tenant of the defendant who fell from her landlord's stepladder which she knew was defective. 118 Mont. at 331, 167 P.2d at 577. The plaintiff was hanging clothes at the time of her accident, and could have found means other than her landlord's shaky stepladder to accomplish that task. In the present case, Shannon was compelled to use either a ladder or an unsupported plank across a deep ditch if he was to perform his plumbing work. Thus, a situation very much like that described in Illustration 5 to Comment (f) of section 343A occurred here:

"5. A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious. C, employed by B in the office, uses the stairway on her way to work, slips on it, and is injured. Her only alternative to taking the risk was to forego her employment. A is subject to liability to C."

In this case Shannon had no control over the manner in which access to the upper floor of "Stillwater B" was provided. The evidence showed that the DeBeer superintendent, James Begley had made repeated requests of Wright and Big Sky supervisors to build temporary stairs for access to the second level of the condominiums. Apparently Big Sky's priority at the time of Shannon's injury was the "commercial core" or "complex" which consisted of several stores, bars, a restaurant, and other buildings, and the carpenters employed by Wright and other subcontractors were kept busy in that area. Francis DeBeer, the president of DeBeer Mechanical testified that Big Sky's head of construction and design, Bing Lancaster, had put strenuous pressure on Wright and the subcontractors to complete the "commercial core" by December 15:

"For instance, he would be thumping on the table and he said, 'I want to be frying hamburgers in the commercial core on December 15th,' and this was an impossibility with the crews that were up there unless something else suffered."

DeBeer further testified that the plumbing subcontractor in a normal situation could expect the general contractor to provide access for the subcontractor's employees, but that in this case, Big Sky's head man on the job exercised his authority to put carpenters and framers onto other jobs:

Normally, in construction work, the general contractor or framer—we'll say the general contractor—will supply us with access into a building and due to the fact that Lancaster thumped the desk and shouted and ranted and raved that he was going to be frying hamburgers in the commercial core so they could open up naturally for the holidays, and they pulled all the framers off.

"Q. Off of what? A. The Stillwater Condominiums and sent them to the commercial core and this forced us into using ladders to gain access to the second floor . . . They gave us stairs in the commercial core and in the hotel but then they were getting down to the nitty-gritty when they wanted to open the commercial core and we had no framers to give us stairs; they were all on the commercial core."

Thus, Shannon had no choice but to continue to use the make-shift access which was available at "Stillwater B". Under those circumstances he is not absolutely barred from recovery on the basis of contributory negligence. The jury was well apprised of the reason for the unsafe conditions, that Big Sky's rush to complete the commercial core resulted in the decision not to provide stairs, and that Shannon had to either forego his employment or continually climb the ladder. It was entitled to consider these factors and the possibility that because of his many trips up and down the ladder Shannon might not always have taken adequate precautions to protect himself from injury.

A related, though somewhat more complicated issue is raised by the defendants' contention that as owner-contractee and general contractor of the project, they owed no duty to Shannon, the employee of a subcontractor. The general question presented here has been the subject of numerous decisions and has generated much policy discussion concerning the appropriate distribution of responsibility for safety and compensation for injuries in the construction industry. See, Sweet, *Legal Aspects of Architecture, Engineering and the Construction Process* 713-19 (1977).

Montana has long recognized the general rule that absent some form of control over the subcontractor's method of operation, the general contractor and owner of a construction project are not liable for injuries to the subcontractor's employees. *West v. Morrison-Knudsen Co.* (9th Cir. 1971), 451 F.2d 493, 495 (construing Montana law); *Wells v. Stanley J. Thill & Associates, Inc.* (1969), 153 Mont. 28, 33, 452 P.2d 1015, 1017-18; *Hackley v. Waldorf-Hoerner Paper Products Co.* (1967), 149 Mont. 286, 295-96, 425 P.2d 712, 717. This general rule however, has sometimes been described as "primarily important as a preamble to the catalog of its exceptions." *Pacific Fire Insurance Co. v. Kenny Boiler & Manufacturing Co.* (1937), 201 Minn. 500, 277 N.W. 226, 228. One court has stated that there are so many exceptions to the general rule of nonliability that the rule is applied only when there is no good reason found not to apply it. *Walker v. Capistrano Sad-*

*dle Club* (1970), 12 Cal.App.3d 894, 898, 90 Cal.Rptr.912, 913-14. See also, Sweet, *supra* at 717-719. Examples of such exceptions as applied to *general contractors* were listed in a decision by the federal district court for Montana in 1960:

"Those cases in which the prime contractor has been held liable to an employee of an independent contractor who comes upon the premises to perform the work which results in his injury are cases where the prime contractor either . . (2) fails to provide a reasonably safe place to work or to warn of any hidden or lurking danger therein; or (3) is responsible for the dangerous condition, such as furnishing defective equipment; or fails to co-ordinate adequately the work of independent sub-contractors." *O'Leary v. James & Wunderlich* (D.Mont. 1960), 192 F.Supp. 462, 473-74, aff'd per curiam (9th Cir. 1961), 288 F.2d 462. See also, Annot. 20 A.L.R.2d 868, 873.

In *Hackley*, this Court noted but did not apply an exception applicable to the owner of the premises under construction:

"While this state has not had to consider the matter there is an exception to the rule which arises when a landlord has retained control over the property on which work is being performed. The landlord then has the duty to use ordinary care; so that the premises will be reasonably safe for the independent contractor's servants." 149 Mont. at 296, 425 P.2d at 717.

Thus, in order to determine whether the general common law rule or its exception applies to this case, it is necessary to determine to what extent the owner Big Sky and the general contractor Wright controlled the working circumstances of the subcontractors at the Stillwater Condominium job site. In the first instance it should be noted that under the applicable definition, plaintiff Shannon and F. E. DeBeer Mechanical must be considered independent contractors. The testimony establishes that in the actual installation of plumbing facilities, Shannon and other DeBeer plumbers were free to use their own means and execute the work according to their own ideas. They were not subject to Wright's or Big Sky's orders as to the details of their work. See *Allen v. Bear*

*Creek Co.* (1911), 43 Mont. 269, 285, 115 P. 673, 679. The exceptions listed in *O'Leary* and *Hackley* do not however rest on whether the general contractor or owner retain control over the *specific manner* in which a worker performs his contractual obligations. Rather, the test stated in *Hackley* applies to the control which the owner has retained *over the property* on which work is being performed. In *O'Leary*, the exceptions concern the failure of the general contractor to provide a safe place to work or to his creating unsafe working conditions by providing defective equipment or inadequately coordinating the work of the various subcontractors at a job site.

With these factors in mind, the testimony of Wright and DeBeer personnel establishes that the exception rather than the common-law rule applies to both Wright and Big Sky, because they retained control over the property and working conditions. The evidence is undisputed that both defendants took an active part in decision-making which affected the working conditions at the Stillwater Condominium complex. Francis DeBeer, (one of the subcontractors), testified that the real reason for the lack of adequate access to the upper floors of the Stillwater Condominiums was Big Sky's insistence on completion of another part of the resort by December 15, 1973. Big Sky's head of construction and design, Bing Lancaster, took steps to assure that completion, which had a direct effect on the working conditions at Stillwater B. In DeBeer's opinion, Lancaster's concern with the commercial core created "an unsafe situation" for the DeBeer employees.

The project manager for Wright Construction Company, Dennis Buchanan, testified similarly, indicating that the Big Sky project was "unusual," in that when construction started, the various structures had not been totally designed. This circumstance, he said, required Big Sky's constant presence at the project. He further testified that Big Sky was "very actively involved" and made design changes from time to time.

The project superintendent for Wright, Wayne Norlen, coordinated the work of various Wright subcontractors such as DeBeer.

278

He testified that Big Sky intervened directly in the matter of stairs to the upper floor of the Stillwater Condominiums. According to Norlen, the original plans called for stairs to be placed as soon as the sub-floors were completed on the second floor, but Big Sky placed a hold order on the stairs because water pipelines had not yet been placed in the ground under the stairs as called for in the plans. Big Sky instructed him however, to proceed with the rest of the condominium project because "[w]e were told that the condos were sold and completion dates were promised to the purchasers."

Norlen also testified in some detail about the matter of access, saying that the reason that the stairs were not built onto the condominiums in the first place was that the DeBeer superintendent, James Begley, had requested that concrete footings not be put in place for those stairs until DeBeer had installed water lines. Later on in the project, as the date for completion of the commercial core drew near, it was Big Sky's emphasis on that portion of the project that deprived the condominium project of the framers who might build even temporary stairs. However, despite Big Sky's demand for framers at the commercial core and its stop order on stairs, Norlen testified that as the project superintendent for Wright Construction he decided not to provide temporary stairs:

"Q. Did you ever consider putting in some temporary stairs prior to October of 1973 even though you were requested not to put in the permanent stairs? A. Yes.

"Q. And yet this was not done? A. No.

"Q. Was that your decision? A. Yes. I might add the reason for that that they weren't installed, my personal feelings were that they would have been more treacherous than the ladders due to the weather conditions at Big Sky."

Finally, Norlen testified that he had never been requested by any subcontractor to provide any temporary stairs. But James Begley and Francis DeBeer, on the other hand, testified that they had repeatedly asked Dennis Buchanan and Bing Lancaster for stairs. Within a few days after Shannon's accident, crews from the framing subcontractor and Wright put in temporary stairs and hand rails.

The evidence of the working relationships among Big Sky, Wright and DeBeer, then, show that Big Sky and Wright had more than a general right to inspect the work of the subcontractor. Specifically it shows that Big Sky and Wright could and did exercise control over the means by which the subcontractors' employees could reach their places of work on the upper levels of the condominiums. The extra hazards created by the need to use extension ladders can be attributed directly to Wright and Big Sky.

Recent decisions by the Supreme Courts of Michigan and Washington have applied the exceptions to the independent contractor rule noted in *O'Leary* and *Hackley* and help explain the rationale for those exceptions, which this Court has not previously applied. In *Funk v. General Motors Corp.*, (1974), 392 Mich. 91, 220 N.W.2d 641, an employee of a plumbing subcontractor brought an action against the owner (G.M.) and general contractor (Darin and Armstrong) for injuries he sustained in a fall at the owner's new plant. Funk, a plumber, was removing a section of pipe from an area near the roof when he fell some thirty feet to the ground. The Michigan Supreme Court acknowledged that Funk was not under direct supervision, and that the immediate cause of his injury was "the manner in which Funk chose to complete the assigned task." Yet the Court concluded that both the owner and the general contractor had retained sufficient control of the common work areas where various subcontractors performed their tasks to charge them with liability for Funk's injury. Funk had based his claim upon the fact that G.M. and Darin and Armstrong had not required the use of safety nets or lines. In finding that G.M., the owner, could be held liable for Funk's injuries, the Court looked in particular to the supervisory authority exercised by a G.M. representative at the construction site, especially over the "common work areas." The Court concluded that this supervisory authority established a proper basis upon which an owner could be held liable for injuries to the employee of an independent subcontractor.

"General Motors is subject to liability because a jury could properly conclude that General Motors, despite its designation as

owner, retained and exercised sufficient control for its own negligence in failing to implement reasonable safety precautions the general contractor and subcontractor." 220 N.W.2d at 648.

As to the general contractor, the Court emphasized the dual policy behind tort law which seeks not only to compensate the victim but also to "encourage implementation of reasonable safeguards against risks of injury." 220 N.W.2d at 646. The Court reasoned that placing the ultimate responsibility for job safety on the general contractor for job safety in "common work area" will, as a practical matter, make it more likely that adequate safety precautions will be taken. It cited approvingly the California decision of *Alber v. Owens* (1967), 66 Cal.2d 790, 59 Cal.Rptr. 117, 121-22, 427 P.2d 781, 785-86.

" '[A]s a practical matter in many cases only the general contractor is in a position to coordinate work or provide expensive safety features that protect employees of many or all of the subcontractors. * * * [I]t must be recognized that even if subcontractors and supervisory employees are aware of safety violations they often are unable to rectify the situation themselves and are in too poor an economic position to compel their superiors to do so'." 220 N.W.2d at 646.

In a more recent decision, the Washington Supreme Court approved the *Funk* rationale as applied to general contractors. *Kelley v. Howard S. Wright Construction Co.* (1978), 90 Wash.2d 323, 582 P.2d 500. In *Kelley*, an employee of a subcontractor fell from a platform laid on structural beams of a bank building project. There were no safety lines or nets. The Washington Court affirmed a judgment for the employee against the general contractor (Wright). The Court quoted approvingly from the *Funk* decision in concluding that Wright owed a common-law duty to the subcontractor's employees to provide them with a safe place to work. 582 P.2d at 505-06. The *Kelley* decision, like *Funk*, places great weight on the general contractor's superior position to require safety precautions by all the subcontractors on a particular job site. "Wright's general supervisory functions are sufficient to establish

control over the work conditions of [the subcontractor's] employee Kelley." 582 P.2d at 505.

"We believe the approach taken by the Michigan Supreme Court is sound. It recognizes the authority the general contractor has to require safety precautions on the job site. This authority over work conditions clearly falls within the rubric of 'control' as an exception to the common law rule of nonliability. The area in which respondent Kelley's accident occurred was one in which four different contractors had worked within a short period of time. Wright had supervisory and coordinating authority over them all. We hold appellant had a duty to see that proper safety precautions were taken in that area to provide the employees with a safe place of work." 582 P.2d at 506.

The present case presents a situation even more compellingly in favor of holding the owner and general contractor liable for the subcontractor's employee's injuries. Big Sky not only retained the supervisory capacity which General Motors had in *Funk*, but exercised that authority in a manner that directly affected the access of the subcontractor's employees to the condominiums, thereby forcing them to climb ladders and crawl through a window casing. In Wright's case, as general contractor, it had the authority to order temporary stairs and handrails built, but its project superintendent, Norlen, decided not to. The plumbers employed by DeBeer were not carpenters and could not have built their own stairway without creating union difficulties. Thus the authority to create safe working conditions rested entirely with Big Sky and Wright. Under these circumstances, the jury could properly find the owner and general contractor liable for injury to a subcontractor's employee.

The defendants contend however, that the jury was improperly instructed by the court's instruction No. 18, which recited the provisions of section 41-1710, R.C.M. 1947, now section 50-71-201 MCA, as applied to prime or general contractors. That statute provides that employers, including prime contractors, must follow certain standards to insure that their employees have a safe place to work:

"Every employer shall furnish a place of employment which is safe for employees therein, and shall furnish and use, and require the use of, such safety devices and safeguards, and shall adopt and use such practices, means, methods, operations and processes as are reasonably adequate to render the place of employment safe, and shall do every other thing reasonably necessary to protect the life and safety of employees."

The definition applicable to "employer" is found in section 92-410.1, R.C.M. 1947, now section 39-71-117 MCA:

" 'Employer' means the state and each county, city and county, city school district, irrigation district, all other districts established by law and all public corporations and quasi-public corporations and public agencies therein and every person, every prime contractor, and every firm, voluntary association and private corporation, including any public service corporation and including an independent contractor who has any person in service under any appointment or contract of hire, expressed or implied, oral or written, and the legal reresentative of any deceased employer or the receiver or trustee thereof."

Defendants contend that under the definitions of employer niether Big Sky nor Wright come within the terms of section 41-1710, aruging that it applies only to those who have "control over the independent subcontractor". Defendants cite *Hackley* in support of this position. It is true that in Hackley this Court held that the employer safety statute at issue there, section 41-1702, R.C.M.1947, did not apply to Waldorf-Hoerner because the injured employee in that case was the employee of an independent contractor. 149 Mont. at 293-94, 425 P.2d at 716. However, since *Hackley*, which was decided in 1967, the legislature has repealed and replaced both the safety statute and definition of employer under which that case was decided. Ch. 341, sec. 30, Laws of Montana (1969), repealing sec. 41-1702 R.C.M.1947 Ch. 154 sec. 2 Laws of Montana (1973) repealing sec. 92-410, R.C.M.1947. The definition of employer in 1967 made no mention of "prime contractors".

Presumably the legislature intended to effect some change by its addition of "prime contractor" to the definition, and logically this was to do away with the distinction between the prime or general contractor's employees and the employees of subcontractors for purposes of the application of the "safe place to work" provisions of section 41-1708 through 1733, R.C.M.1947, now sections 50-71-101 through 110, 201 through 203, 301 through 303, 311 through 316, 321 through 327, and 331 through 334 MCA. This application of a "safe place to work" statute is supported by decisions in others jurisdictions, notably the *Kelley* decision discussed previously. There the Court found that not only did the common law support a finding of general contractor liability, but also the Washington safety statute then in effect. The Court reaffirmed its ruling in *Bayne v. Tood Shipyards Corp.* (1977), 88 Wash.2d 917, 568 P.2d 771, in which it applied a safety statute similar to section 41-1710, to any "worker who is lawfully on the premises in pursuit of his own employment and at the invitation of a third party . . ." 568 P.2d at 773.

Defendant Big Sky argues that section 41-1710 cannot apply to Big Sky as a owner, but that issue is not a problem here. Instruction No. 18 which described section 41-1710 to the jury, by its very terms limited the application of the statute to prime or general contractors. Thus, by its wording, instruction No. 18 could only be understood by the jury to apply to Wright Construction.

In summary we hold that the plaintiff is not barred from recovery by contributory negligence because he had no way to avoid the unsafe conditions which existed at "Stillwater B" other than foregoing his employment and because it was foreseeable to the defendants that he might forget to exercise a sufficient degree of caution in his repeated trips up and down the ladders. Moreover, Big Sky and Wright had a duty to provide the employees of their subcontractors with a safe place to work because each retained control over the working conditions at the Stillwater condominium site.

The judgment of the District Court is affirmed.

284

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY and SHEEHY concur.