No. 96-343

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


NEIL J. LYNCH and CHARLOTTE F. LYNCH,

Plaintiffs and Appellants,

v.

DEAN REED and BARBARA REED,

Defendants and Respondents.


APPEAL FROM:  District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable James E. Purcell, Judge presiding.


COUNSEL OF RECORD:

For Appellants:

David R. Paoli, Attorney at Law, Missoula, Montana

R. Lewis Brown, Attorney at Law, Butte, Montana

For Respondents:

Gary L. Walton; Poore Roth & Robinson, Butte, Montana

Scott W. Reed, Attorney at Law, Salt Lake City, Utah



Submitted on Briefs: May 22, 1997

Decided: August 28, 1997
Filed:


_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

Neil J. and Charlotte F. Lynch (the Lynches) appeal from the judgment and underlying jury verdict of the Second Judicial District Court, Silver Bow County, in favor of respondents Dean and Barbara Reed (the Reeds).  The Lynches also appeal rulings of the District Court denying them the opportunity to present certain evidence to the jury regarding construction safety standards.  We affirm in part, reverse in part and remand to the District Court for further proceedings.

We address the following issues on appeal:

1.  Does this Court have jurisdiction to hear the appeal?

2.  Did the District Court commit reversible error by excluding employment safety regulations including OSHA and ANSI from the trial of the case?

3.  Did the District Court err in denying the Lynches' motion for a new trial on the  basis that they were denied an opportunity to fully cross-examine the Reeds' expert witness?

4.  Did the District Court err in denying the Lynches' motion for a new trial on the  basis that their expert witness was not permitted to testify as to the basis of his expert opinions?

5.  Are the Lynches entitled to a new trial because of defense counsel's remarks regarding Neil Lynch's prior motorcycle accident?

Factual and Procedural History

In 1991 the Reeds began construction of a retirement cabin on property they had purchased at Georgetown Lake.  The Reeds contracted with Dale Fredlund, a Butte log home builder to excavate the foundation and install the log home package.  Dean Reed (Reed) had been working part time for Fredlund erecting log home packages at Fredlundþs property.  In exchange for Reed's help in erecting the Reed log home package, Fredlund reduced the overall price of  the package.

After the excavation was completed, Reed contracted with two masonry companies for the construction of the foundation.  Once the foundation was completed, Reed contracted with two carpenters for the installation of the floor joists and floor decking.

When the floor decking was completed, two openings were left in the decking.  One was for the installation of the stairway from the basement and the other was for the installation of a fireplace.  After the carpenters had completed their work, Fredlund returned to the site to begin the installation of the log home package in accordance with his contract with the Reeds.

Reed and Neil Lynch (Lynch) were acquaintances and would periodically discuss the progress of the cabin.  Lynch agreed to come to the construction site and help with the erection of the log home package.  At this point in the construction, the log walls were approximately eleven courses high.  When this type of  log home is erected, the doorways and windows are cut into the walls after the walls have been erected.

Consequently, a person must go through the basement to access the interior of the cabin.

On September 25, 1991, Lynch arrived at the Reeds' property and gained access to the main floor of the cabin by entering the basement and climbing up an extension ladder. The extension ladder passed through the opening in the floor which had been left for the future installation of the stairs. The stairway opening in the floor decking was approximately four feet wide by eight feet in length. Two sheets of plywood covered approximately one-half of the stairway opening. The fireplace floor hole opening was covered with plywood, logs and saw horses.

After Lynch was on the main floor of the cabin, Reed instructed him to wait while Reed and Fredlund retrieved another log from outside the cabin. While Lynch was waiting, he decided to move the plywood that was next to him on the floor and set it up against the wall, out of the way. Lynch approached the piece of plywood, picked it up with both hands, raised it to his chest and stepped forward in an effort to push it toward the wall he was facing. Once he stepped forward, he fell into the hole that the loose piece of plywood had covered. Lynch fell approximately eight feet to the basement's dirt floor; he was paralyzed as a result of the accident.

The Lynches filed suit to recover damages for the personal injuries suffered by them as a result of Neil Lynch's accident. Before trial, the District Court granted the Reeds' motion in limine restricting the Lynches from presenting evidence on construction site safety standards. The court further denied the Lynches' attempts to introduce the standards during trial and limited Lynches' cross-examination of Reeds' expert. Following a three-day trial, the jury returned a verdict in favor of the Reeds.

After entry of judgment for the Reeds, the Lynches moved for a new trial. The motion was received by the court but, due to a clerical error, was not filed with the clerk of court. Thereafter, the Lynches filed a brief in support of their motion for new trial. Two days later the Lynches filed a notice of appeal. In an order dated July 31, 1996, the District Court ruled that it did not have jurisdiction to rule on the Lynches' motion for new trial by virtue of the notice of appeal. The Lynches appeal from the judgment entered on the jury verdict and other orders of the District Court.

## Discussion

### 1. Does this Court have jurisdiction to hear the appeal?

The Reeds contend that this Court lacks jurisdiction to hear this appeal because the Lynches filed their notice of appeal while their motion for new trial was still pending in the District Court. According to Rule 5(a)(4), M.R.App.P., a notice of appeal filed

before disposition of a Rule 59 motion for new trial has no effect.  On July 31, 1996, the District Court ruled that it did not have jurisdiction to hear the Lynches' "motion" because of the subsequent filing of the notice of appeal.  The Reeds argue that because the District Court ruled that it did not have jurisdiction to rule on the motion, the Lynches' motion for a new trial was deemed denied on August 11, 1996, and, pursuant to Rule 5(a)(4), M.R.App.P., the Lynches were required to re-file a notice of appeal no later than thirty days after their motion for a new trial was deemed denied.  The Reeds contend that because the Lynches did not re-file a notice of appeal, this Court does not have jurisdiction to hear their appeal.

In its order ruling that it did not have jurisdiction to hear the "motion" for new trial, the District Court stated: "Plaintiffs filed a Brief in Support of Plaintiffs' Motion for a New Trial; however, Plaintiffs never filed a Motion for a New Trial."  The Lynches argue that this order led them to believe that the clerical error in failing to file the motion for a new trial with the District Court was fatal to that motion and that, therefore, their notice of appeal was timely filed.  We agree.  Because the motion for new trial was never filed it was a nullity and the Lynches' subsequent notice of appeal was timely filed.  This Court has jurisdiction to hear the appeal.

2.  Did the District Court commit reversible error by excluding employment safety regulations including OSHA and ANSI from the trial of the case?

The standard of review of a district courtþs discretionary ruling is whether the district court abused its discretion.  Durbin v. Ross (1996), 276 Mont. 463, 477, 916 P.2d 758, 767; State v. Santos (1995), 273 Mont. 125, 137, 902 P.2d 510, 517.  The abuse of discretion standard applies to trial administration issues, post-trial motions and similar rulings.  Montana Rail Link v. Byard (1993), 260 Mont. 331, 337, 860 P.2d 121, 125.

The Reeds submitted a motion in limine requesting that the Lynches be restricted from mentioning any construction site safety standards.  The District Court granted the Reeds' motion in limine in several respects.  The District Court ruled that Occupational Safety and Health Administration Regulations (OSHA), American National Standard Safety Requirements (ANSI), and Montana's Construction Site Health and Safety Act were inadmissible on the issue of the Reeds' negligence because the "safety standards in question do not have the force of law. . . ."  The District Court had the opportunity to analyze this issue at various junctures since  the Lynches persistently raised the issue throughout the trial.

The Lynches' argument on appeal focuses on the District Court's exclusion of OSHA and ANSI regulations, and we will therefore discuss only those regulations. The Lynches argued to the District Court, and argue here, that the Reeds' failure to comply with OSHA regulations and ANSI standards is evidence of their negligence and, thus, admissible. The Reeds, on the other hand, contend that OSHA and ANSI are not applicable to an individual who is constructing his own private residence.

The Lynches argue that in granting the Reeds' motion in limine regarding safety standards, the court incorrectly relied on Hackley v. Waldorf-Hoerner Paper Products Co. (1967), 149 Mont. 286, 294-95, 425 P.2d 712, 716, for the proposition that "evidence of safety standards that do not have the force of law are inadmissible on the issue of negligence." In Hackley, this Court considered two rulings by the district court in which the district court had refused the use of evidence on safety standards for any purpose. The first issue considered by this Court was whether the district court had erred in refusing to permit any testimony on the "minimum Safety Standards for the Construction Industry, section 41-1702, R.C.M. 1947. . . ." Hackley, 425 P.2d at 716. The Court began its analysis by examining the language of the statute at issue. The statute in Hackley, as the OSHA regulations here, spoke in terms of an "employer's duty." The Courtþs decision that evidence of the statutory safety standard was properly excluded was based on its conclusion that the statute imposed "no duty" on the defendant because it was not an employer of the injured person. Hackley, 425 P.2d at 716.

The second issue this Court analyzed involved the district court's refusal to admit industry safety standards. This Court affirmed the district court's exclusion of the standards on the basis that advisory material "not having the force of law, is not admissible on the issue of negligence." Hackley, 425 P.2d at 716.

The Lynches argue that Hackley is no longer good law in Montana and is not applicable to this case for two reasons: it was ruled on prior to the adoption of the standards and codes in question, and it was based on an annotation which has since been superseded. The Lynches point out that in Hackley, this Court, following the majority rule set forth in 75 A.L.R. 2d 778, affirmed the district court's refusal to admit standards promulgated by the American Standards Association. However, that annotation has been superseded by 58 A.L.R. 3d 148 which states that "the modern trend toward greater admissibility of these codes and standards has apparently been great enough to make it unwise to attempt to identify any majority or minority rule."

The Lynches argue that this Court recognized Hackley's shortcomings in Runkle v. Burlington Northern (1980), 188 Mont. 286, 613 P.2d 982. The Runkle decision acknowledged that post-Hackley decisions "seem to be moving toward acceptance in evidence of such advisory material with certain qualifications. Such treatises may be admitted upon the foundation that they (1) show what is feasible to the jury, or (2)

show
what the defendant knew or should have known about safety precautions." Runkle, 613 P.2d at 993.

However, the Court in Runkle also established the following rule for admissibility
of industry standards and codes:

Unless the codes or standards are adopted by a governmental agency so as to have the force of law, they are not to be admitted as conclusively determining the standard of care imposed upon the defendant, nor as substantive evidence of negligence, unless coupled with a showing of general acceptance in the industry concerned.

Runkle, 613 P.2d at 993 (citations omitted) (emphasis added). We interpret this rule as
providing two separate tests for the admissibility of codes or standards: 1) a code or
standard sought to be admitted for the purpose of "conclusively determining the standard
of care imposed upon the defendant" must have been adopted by a governmental agency so as to have the force of law; 2) where a code or standard does not have the force of
law, it may nevertheless be admitted as substantive evidence of negligence if it is coupled
with a showing of general acceptance in the industry concerned.

In interpreting the rule from Runkle in this manner we must necessarily overrule Hackley, insofar as it holds that evidence of codes or standards of safety issued by governmental bodies as advisory material but without the force of law, are never admissible on the issue of negligence.

Under the rule in Runkle we must first determine whether OSHA or ANSI have "the force of law" as applied to the Reeds. The regulations interpreting OSHA provide
in part that "[a]ny employer employing one or more employees would be an 'employer engaged in a business affecting commerce who has employees' and, therefore, he is covered by the Act as such." 29 CFR  1975.4. The Lynches argue that the Reeds are covered by OSHA under this definition of employer because the Reeds "employed a crane operator-laborer, cement and brick mason, and carpenters" and because the construction
of the Reeds' cabin falls under the broad category of businesses that are in a class of
activity that as a whole "affects" commerce.

The Lynches argue that OSHA was developed to protect any person rightfully on the job site, not just employees, and therefore Lynch was a person covered under the Act.
Cases cited by the Lynches in support of their theory that OSHA protections encompass non-employees discuss the "multi-employer doctrine," which has developed as a means of apportioning liability at multi-employer work sites where one employer has created a
hazard and some employees, but not necessarily its own, are exposed to the hazard. See
Arrington v. Arrington Bros. Const., Inc. (Idaho 1989), 781 P.2d 224 (holding that an employer's OSHA duties may run not only to his own employees, but to any other employees or persons in general on a multi-employer worksite); Teal v. E.I. DuPont

de

Nemours and Co. (6th Cir. 1984), 728 F.2d 799 (recognizing employers' and commercial general contractors' duties under OSHA to protect all employees on a multi-employer worksite); see also Anthony Crane Rental, Inc. v. Reich (D.C. Cir. 1995), 70 F.3d 1298.

We find these cases inapplicable to the instant case because the Reeds' log cabin construction project is not a "multi-employer worksite." Furthermore, all of the cases cited by the Lynches require that, before employers are obligated to protect all persons rightfully on the worksite, it must first be established that the employer is deemed responsible for complying with OSHA regulations at all. Teal, 728 F.2d at 804.

Accordingly, the first question to be answered is whether the Reeds are employers under the Act. OSHA defines employer as "a person engaged in a business affecting commerce who has employees." 29 U.S.C. 625(5). In the instant case, the uncontroverted facts are that Lynch was not an employee of the Reeds at the time of the accident and that the other workers on the site were independent contractors. It has been held that OSHA does not apply to an owner where the worker on the owner's property is an independent contractor and not an employee of the owner. Cochran v. International Harvester Co. (W.D. Ky. 1975), 408 F.Supp. 598; see also Ellis v. Chase Communications, Inc. (6th Cir. 1995), 63 F.3d 473, 478 (holding the "multi-employer doctrine" of Teal inapplicable to a non-employer defendant whose status was "no different than a property owner hiring a contractor to perform work on its property"). But see Williams v. Kopco (D. Kan. 1997), 162 F.R.D. 670 (relying on Teal in holding that independent contractors are in the class of persons OSHA regulations were designed to protect). Given that none of the persons assisting Reed in the construction of the cabin was Reed's employee, Reed is not an "employer" under OSHA. We therefore hold that OSHA was not applicable to the Reeds and thus did not have the force of law.

Likewise, ANSI requirements do not apply. Section 1.1 of the standards provides:

This standard is intended to provide protection to persons in all places where there is danger of persons or materials falling through floor or wall openings, or from stairways, platforms, or runways. This standard applies to temporary or emergency conditions as well as to permanent conditions. It does not apply to construction work covered by American National Standard Safety Requirements for construction A10 Series, or to private residences.

Thus, by its own terms, the ANSI standards do not apply to the construction at the Reedsþ private residence.

Under the second test in Runkle, if standards do not have the force of law, they may still be admissible to show negligence if coupled with a showing that they are generally acceptable in the industry concerned. The Lynches argue that OSHA standards are generally acceptable in the construction industry and thus should have been admitted.

We hold, however, that construction of an individual's private cabin undertaken by a non-commercial owner-builder is not part of the "construction industry" as a whole and therefore the District Court properly excluded evidence of ANSI and OSHA standards. The Lynches have failed to show that the District Court abused its discretion in precluding evidence of OSHA regulations and ANSI standards. Therefore, the District Court did not abuse its discretion in granting the Reeds' motion in limine nor in its other rulings excluding admission of these safety standards except as discussed in the next issue.

3. Did the District Court err in denying the Lynches' motion for a new trial on the basis that they were denied an opportunity to fully cross-examine the Reeds' expert witness?

The standard of review of a district court's ruling on a motion for a new trial is the same as our standard for reviewing discretionary trial court rulings; that is, whether the district court abused its discretion. Hando v. PPG Industries, Inc. (1995), 272 Mont. 146, 149, 900 P.2d 281, 282.

During direct examination, the Reeds' expert witness testified that the Reeds had met minimum safety standards. The court refused to allow the Lynches an opportunity to fully cross-examine the expert regarding that testimony. The Lynches claim that their cross-examination was unduly restricted in that they should have been allowed to cross-examine the expert regarding matters raised on direct examination and that they should have been allowed to examine the witness regarding the basis of his expert testimony. In relevant part, the direct examination of the Reeds' expert was as follows:

Q.   Do you think that, and in your opinion, what the Reeds did would meet the minimum safety standards?

A.   Yes, in my opinion.

Q.   And what they did, is it customary in the industry?

A.   Yes, it is.

The Lynches contend that they should have been allowed to cross-examine the expert with regard to the opinion expressed during his direct examination. "It is axiomatic that a witness may be cross-examined on any subject raised or fact stated on direct examination." Hando, 900 P.2d at 283; Rule 611(b)(1), M.R.Evid. Accordingly, the Lynches argue that they should have had the opportunity to fully cross-examine the Reeds' expert regarding his knowledge of "minimum safety standards," including OSHA and ANSI, as they provide the minimum safety standards for the construction industry. The Reeds claim that the Lynches were afforded an opportunity to fully cross-examine the Reeds' expert in regard to his statement regarding minimum safety

standards.
They point to the following questions and answers during the cross-examination:

Q.   Mr. Walton asked you about minimum safety standards and whether those had been met in this case.  What minimum safety standards are you referring to?

A.   Well, I don't know if they would be actual minimum safety standards.  Itþs kind of a common sense, case-by-case scenario.

Q.   Well, when you answered Mr. Walton's questions, you apparently had an understanding of what minimum safety standards there were.

A.   Well, I would consider any, any protection would be a, a safety standard.  If youþve got one protection, it would be a minimum safety standard.

Q.   Do you know that you erect a railing as a minimum safety standard on a floor hole opening like this.

The Reeds objected to this question and, outside the presence of the jury, the Lynches claimed that the door had been opened for them to inquire of the witness concerning "minimum safety standards" and that they could impeach the witness on his knowledge of OSHA standards.  In response to the Lynches' argument, the court stated: "You have the right to cross-examine him.  You can ask him what he understands. You've asked him that . . . . I made a ruling in regards to this OSHA thing, and I'm going to stand by that decision . . . ." After the bench conference, the Lynches' counsel continued with cross-examination as follows:

Q.   Clay, I think when we broke, we were talking about minimum safety requirements.

A.   Yes.

Q.   And would you tell me, please what you mean when you say minimum safety requirements.

A.   By minimum, would be just something to make something safer would be a minimum requirement.

Q.   Okay.  But your knowledge as to what are minimum safety requirements is based on your experience, correct?

A.   Yes, it is.

The Reeds argue that the Lynches fully cross-examined their expert on what he meant by a minimum safety standard.  They argue that the expert's definition of a minimum safety standard was entirely consistent with his opinion that the Reeds had met such a standard.  We disagree.  The witness was testifying as an expert on construction site safety standards.  By stating that the Reeds had met the minimum safety standards,

he opened the door to cross-examination on his knowledge of minimum safety standards in the industry, not simply on any one person's common sense perception of safety standards. "Minimum safety standards" implies something more than mere subjective determinations on a case-by-case basis. When the Reeds' expert testified as to "standards," he left the jury with the impression that the Reeds had complied with an objective, rather than a subjective, gauge. In the construction industry, the objective standards are embodied in the OSHA and ANSI regulations. The Lynches were prejudiced when the court denied them the latitude to cross-examine the expert about his knowledge of the safety standards in the industry. Due to the prejudice arising from this error, the Lynches are entitled to a new trial.

In order to avoid confusion as to our rulings on Issues two and three, we summarize the two holdings as follows: In Issue number two we held that OSHA and ANSI standards are not admissible to prove negligence in a case of an individual owner constructing his own home. However if, despite the inadmissibility of such evidence, the owner offers expert testimony that he did comply with "the minimum safety standards," then he has chosen to inject that issue into the case. Opposing counsel then must be afforded the opportunity to cross-examine the expert as to his understanding of those "standards." Thus, although evidence of the standards is not admissible against an owner-builder as substantive evidence of negligence, such evidence may be legitimate fodder for cross-examination depending upon the scope of the defendant's expert's testimony. Due to the court's restricting of the cross-examination of the Reeds' expert, the jury was left with the impression that the Reeds had complied with "the minimum safety standards." This prejudiced the Lynches' case, and they are entitled to a new trial.

4. Did the District Court err in denying the Lynches' motion for a new trial on the basis that their expert witness was not permitted to testify as to the basis of his expert opinions?

The Lynches claim that they are entitled to a new trial because their expert was not permitted to testify regarding the basis of his expert opinions. While the Lynches' expert was permitted to base his opinion on OSHA, ANSI, and other applicable safety standards, he was not permitted to testify that those standards formed the basis of his opinion. The Lynches claim that Rules 703 and 705, M.R.Evid., provide that an expert may base his or her opinion on inadmissible evidence and may testify as to the basis of that opinion. While we agree that the Rules of Evidence allow an expert to base his or her opinion on inadmissible evidence, we do not agree that the rules mandate that an expert testify as to the basis of that opinion. Rule 703 provides that inadmissible evidence may be relied on by experts in forming their opinions and Rule 705 provides that experts may be required to disclose the facts or data underlying their opinions. As mentioned

before, the admissibility of evidence must, in every case, be left largely to the sound discretion of the trial court.  Cech v. State (1979), 184 Mont. 522, 531-32, 604 P.2d 97, 102; Moen v. Peter Kiewit & Sons' Co. (1982), 201 Mont. 425, 655 P.2d 482.  The trial court's discretion includes wide latitude in determining the admissibility of expert testimony.  Durbin, 916 P.2d at 767; Cash v. Otis Elevator Co. (1984), 210 Mont. 319, 332, 684 P.2d 1041,1048.

The Lynches' expert was allowed to testify as to the substance of OSHA and ANSI standards; he was merely prohibited from identifying the source of the standards.  The Lynches' expert testified more than once that, in his opinion, safety practices that could have been undertaken by the Reeds included installing a guardrail around the opening, securing the plywood in place, or building a temporary floor.  It was only when the expert identified those practices as "standard practices" that the Reeds' counsel objected, and the court foreclosed the expert from identifying the specific standards.  The Lynches' expert was not, as claimed by the Lynches, prevented from lending his special expertise to the issues before the jury.  The jury was permitted to weigh the opposing opinions of the two experts and, therefore, the Lynches were not denied a fair trial on the basis of this alleged error.

5.  Are the Lynches entitled to a new trial because of defense counsel's remarks regarding Neil Lynch's prior motorcycle accident?

The final pretrial order listed five legal issues the parties sought to have decided before the commencement of trial.  The first issue was: "Whether the fact of and settlement of litigation arising out of Neil Lynch's 1984 motorcycle accident should be excluded at trial."  On the morning of trial the Lynches moved that no mention be made of "the facts and settlement of litigation arising out of Neil Lynch's 1984 automobile accident."  When the Reeds' counsel inquired as to the scope of the motion and whether it included Lynch's receipt of disability benefits, the Lynches' counsel replied: "It's everything."  The court excluded evidence of the settlement but left open the question of whether evidence of Lynch's resulting injuries might be admissible.

In cross-examining Lynch about his mental distress claim, the Reeds' counsel asked Lynch the following question, which was objected to by the Lynches' counsel: "And you associated that mental distress, however, not with this accident, but your motorcycle accident, correct?"  It is clear that this was a legitimate line of cross-examination relating to the nature of Lynch's motorcycle injuries, an issue which the court earlier had ruled would be handled as it came up.  Therefore the Reeds' counsel did not violate the court's exclusionary rule as to the settlement of the motorcycle

accident suit.  We affirm the District Court on this issue.

In summary, we hold that the District Court did not err in excluding evidence of OSHA and ANSI standards as substantive evidence of the Reeds' negligence in its order granting the Reeds' motion in limine.  However, since the Reeds opened the door to the minimum safety standards during direct examination of their expert, the District Court abused its discretion in preventing the Lynches from fully cross-examining the Reeds' expert on these standards, and the Lynches are therefore entitled to a new trial.  We affirm in part, reverse in part and remand for a new trial.

/S/  W. WILLIAM LEAPHART

We concur:

/S/  JAMES C. NELSON
/S/  JIM REGNIER
/S/  TERRY N. TRIEWEILER
/S/  KARLA M. GRAY
/S/  WILLIAM E. HUNT, SR.